JOURNAL ENTRY AND OPINION
Defendant-appellant Nabil Jaffal appeals from his convictions following a jury trial for aggravated burglary (R.C. 2911.11); felonious assault (R.C. 2903.11); vandalism (R.C. 2909.05); and failure to comply with an order or signal of a police officer (R.C.2921.331). Defendant was also found guilty of two repeat violent offender specifications. Defendant contends his convictions were against the manifest weight of the evidence. We find no error and affirm.
This case arose out of an episode involving defendant's girlfriend, Mia Jones-Stubbs, on October 11, 1998. Mia testified that she had a relationship on and off with defendant since 1995. Although defendant never lived with her, he stayed over from time to time, but never possessed a key to her apartment. Defendant showed jealous tendencies during the relationship and, especially when drinking, would erupt with physical violence, striking Mia in the face on numerous occasions. Although Mia reported these attacks to the police several times, she never pressed charges or followed through with the prosecution due to defendant's manipulation, promises to change and her emotional attachment to him. Each time Mia would forgive defendant and allow him back into her life. Eventually, Mia was forced to put a block on her phone to prevent defendant from calling her.
In September 1998, defendant circumvented the block and professed his love for her and his inability to live without her. She finally agreed to meet defendant where she was again struck by him in the face requiring another emergency room visit and appointment with her doctor. Temporal mandibular joint dysfunction (TMJ) was diagnosed. Again, Mia did not follow through with the prosecution for that incident because she felt sorry for defendant. Mia explained that defendant's intimidation and threats included telling her that he knew that her grandmother shopped at a grocery store owned by his cousins. Defendant also told her that a girl he used to date disappeared and was never found again.
Mia further testified that on October 10, 1999, she reluctantly agreed to go to the movies and dinner with defendant. Defendant drove his black Taurus station wagon to her apartment at 24451 Lake Shore Boulevard in Euclid, Ohio. He showered and changed clothes in her apartment. They left together in Mia's 1994 Cadillac, but missed the start of the movie and then decided to go to the Flats for dinner. After dinner, they went to a karaoke bar where defendant consumed three beers and two doubles of brown liquor in one hour. Defendant then angrily confronted three gentlemen who were speaking to Mia. Mia was able to get defendant to leave the bar and they argued in her car about the incident. Due to defendant's intoxicated rage and her fear of defendant's violent history, Mia asked defendant to get out of the car and take a taxi home. Defendant refused. Mia then started to drive home and while at a red light asked defendant to check a noise she heard from a rear tire. When he got out, she drove off and left him there. Defendant immediately began paging Mia repeatedly.
Mia continued driving home, but stopped at a donut shop where she met an acquaintance she knew as Derron. Mia convinced Derron to come over to her house because she feared defendant and did not want to go home by herself. Mia specifically told Derron that:
 Well, I just have this feeling that he's going to do something bad to me. He's been drinking, and he's always been violent. When they arrived at her apartment, Mia and Derron talked about her situation with defendant for 30-40 minutes. Mia then locked the two door locks and went to bed in her bedroom with Derron as protection.
Early the next morning, Mia was awakened by the sound of defendant choking Derron in her bed. A violent struggle erupted during which Mia attempted to assist Derron in defending himself against defendant. Mia believed defendant would kill Derron. The struggle between defendant and Derron went from the bedroom to the living room and out into the apartment hallway. At this time, Mia noticed that the door and locks to her apartment had been badly damaged. Eventually, Derron was able to get on top of defendant and defendant agreed to leave. Derron then let him go and defendant left.
While Mia was on the phone with the police, and while Derron was in the bathroom treating his injured eye, defendant returned carrying a baseball bat. Mia screamed please don't do anything to me and defendant said I am going to kill you, bitch. Defendant then punched her in the face and when she fell onto the couch, defendant hit her in the face with the bat. She was struck twice in the face by the bat, but managed to deflect several other blows with her arms and hands. Defendant then realized the cordless phone was still on and threw it against a Chinese mirror hanging on the wall shattering it. Immediately thereafter, defendant started banging up her television with the bat allowing Mia to escape into her son's bedroom. Mia hid in the bedroom and began to pray God, please just save me. Don't let him kill me. Defendant started down the hallway, but then suddenly turned and left the apartment.
Mia used the bedroom phone to call police and noticed out the window that defendant's black Taurus station wagon was being chased by police cars with their overhead lights flashing and sirens blaring. EMS personnel soon arrived and Mia was treated at the scene. She was then transported to Euclid General Hospital where she was treated for cuts to her lip, facial swelling, bruises and injuries to her jaw which prevented her from opening her mouth. Medical records were admitted from Euclid General verifying these injuries and her emergency treatment. Mia identified photos of her injuries, blood stains on her apartment floor and bathrobe and damage to the mirror, front door, leather couch, telephone and television in her apartment. Mia also identified photos of damage to her car and testified that she learned of the damage while at the hospital. The damage to her car included all the windows broken out, the headlights broken, the seats sliced up and the grille punched out.
Mia testified that she and her mother paid $7,400 to fix her car and the damage in her apartment was approximately $3,500. Mia also testified that the door leading to the garage where her car was parked had been damaged.
Mia continued her testimony by explaining that although Derron did not aid her when defendant entered the apartment with the bat, he did go to the hospital to see her and cooperated with the police. Mia did not see Derron again after that morning. Mia also identified the defendant in court as the person who attacked her and Derron and damaged her apartment on October 11, 1998.
James Slivers, a Euclid firefighter and advanced emergency medical technician, also testified for the State. Slivers testified that he had been dispatched to the scene of the attack. While in route, his large ambulance with its lights and sirens activated was forced to the curb of the road by a black car without headlights veering toward them. He also observed several police cars with their lights and sirens activated chasing the black car, but the black car refused to stop.
Slivers identified Mia's injuries including swelling to the right side of her face, an abrasion to her chin area, reddening of the lower and upper lip and reddening and swelling below her left eye. Slivers further testified that when he arrived at the scene, Mia's apartment was in disarray.
Patrolman Robert Truman, a sixteen-year veteran of the Euclid Police Department testified that he chased the defendant's black Taurus from the scene of the attack. Truman testified that when he pulled into the apartment's parking lot, he was immediately advised by another unit to assist in chasing the suspect's fleeing vehicle. He soon observed the vehicle fleeing from another police unit with sirens and lights activated and noticed that one of the Taurus' rear tire was flat. He and the other police car chased the defendant at speeds ranging from 40 to 50 m.p.h. Defendant continued to ignore the police orders to stop and raced west on I-90 at 70 to 85 m.p.h., swerving two or three times toward Patrolman Truman's police car to prevent him from pulling up next to the Taurus. Patrolman Truman testified that he considered himself to be in danger during this high speed chase when defendant swerved toward his police car.
Defendant's black Taurus finally came to a stop on the Innerbelt Bridge. Defendant exited and began running from the police who shouted for him to stop. He ran about a quarter of a mile on the bridge, then climbed the rail and jumped, falling approximately 130 feet into the Cuyahoga River below. Patrolman Truman later learned that defendant, soaking wet, was arrested a short time later by Cleveland Police in a phone booth.
The State's final witness was Detective Michael Grida, a seventeen-year veteran of the Euclid Police Department. Det. Grida testified as to the Euclid Police Department's policy for pursuits, recording 911 and dispatch transmissions, and the different sounds recorded on the 911 tape admitted to evidence. He also described the chase and certain aspects of Mia's apartment complex.
Det. Grida further described his efforts to identify and locate Derron Lewis (a.k.a. Derron Coleman). Mia identified a photo of Derron Coleman. Det. Grida was unable to locate Mr. Coleman, but learned that he had failed to appear for a pre-trial conference scheduled in a criminal matter on September 25, 1998 and a capias had been issued for his arrest.
Defendant's sole assignment of error states as follows:
 I. APPELLANT'S CONVICTIONS FOR AGGRAVATED BURGLARY, FELONIOUS ASSAULT AND VANDALISM MUST BE REVERSED AS THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
The standard of review we must observe in passing on the manifest weight of the evidence issues was set forth by the Supreme Court of Ohio as follows in State v. Thompkins (1997), 78 Ohio St.3d 380,387:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. (Emphasis added.) Black's supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 (The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction).
Defendant asserts that his convictions were based primarily on Mia's testimony and that her testimony was riddled with internal and external inconsistencies, so as to be too implausible to support these convictions by the manifest weight of the evidence. It is well established that the weight given to the testimony and the credibility of the witnesses is within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Defendant first claims that Mia testified that she was attacked by defendant with a baseball bat, yet she never mentioned a bat to the paramedic who treated her nor did the paramedic testify to any injuries to her hands and arms from a bat. However, the record reflects that Mia unequivocally testified that defendant returned to her apartment with a baseball bat, threatened to kill her, punched her in the face and hit her in the face twice with the bat after she fell onto the couch. She further testified that she deflected several other blows with her arms and hands. This testimony was corroborated by the testimony of Mr. Slivers, the paramedic who treated Mia at the scene, who testified to her injuries which included swelling on the right side of her face, an abrasion on her chin, and reddening and swelling below her left eye and on her upper and lower lips. Contrary to defendant's claim, Mr. Slivers never testified that Mia did not suffer any injuries to her hands or arms from a baseball bat. He merely testified that he could not recall treating her at the scene for any injuries to her hands or arms. Mia's testimony was further corroborated by the medical report from Euclid Meridia Hospital which stated that her admitting diagnosis was Hit in face w/ baseball bat. (State's Ex. 7).
Defendant also claims that Mia's allegations regarding the amount of the damage to her apartment was unsupported by any documentation. Mia testified that the damage to her apartment caused by defendant was approximately $3,500. She testified that her Chinese mirror was shattered, her front door was broken, her couch was ripped from the broken glass falling on it, her T.V. was damaged and her bedroom set was mangled up. The State admitted several photographs of the damage which depicted the broken Chinese mirror on the wall, the broken glass on the couch, a hole in the wall, the broken locks on the front door and the blood stains throughout the apartment. (State's Exs. 1-F to 1-V). In any event, the jury concluded that Mia's testimony and the photographs were consistent and sufficient to show that defendant knowingly caused serious physical harm to Mia's apartment and property as required under R.C. 2909.05.
Lastly, defendant asserts that Mia's testimony that she deceived defendant and abandoned him because she was afraid of him was in stark contrast to her subsequent actions, i.e., going to a donut shop, picking up a strange man and getting in bed with him. We do not find that Mia's testimony was inherently implausible or unreliable simply because she tricked the defendant into getting out of her car and then leaving him there. We find that this testimony was reliable and consistent with her fear of defendant and why she sought protection from another male in case defendant returned to her apartment seeking revenge.
After a review of the entire record and the reasonable inferences the jury was entitled to draw from the evidence, we cannot say that the jury clearly lost its way or created a manifest miscarriage of justice requiring reversal of the convictions.
Defendant's sole assignment of error is overruled.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
 ____________________________ JAMES M. PORTER, J.
DYKE, A.J., and ANNE L. KILBANE, J., CONCUR.